IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON

NATHAN ROBERT GONINAN,

                Plaintiff,                                    6:12-cv-01555-PK

v.                                                            OPINION AND ORDER

DENNIS HOLMES, TIM CAYTON,
and GARY SIMS,

                Defendants.

_____

PAPAK, Magistrate Judge:

        Plaintiff *pro se* Nathan Goninan filed this action against defendants Dennis Holmes, Tim

Cayton, and Gary Sims on August 28, 2012. By and through his complaint, Goninan alleges the

defendants' liability for violation of his First Amendment right to reasonable accommodation of

his religious beliefs, violation of his Fourteenth Amendment Right to equal protection, and

violation of the Religious Land Use and Institutionalized Persons Act. This court has federal-

Page 1 - OPINION AND ORDER

question jurisdiction over Goninan's claim pursuant to 28 U.S.C. § 1331.

Now before the court is defendants Holmes, Cayton, and Sim's motion for summary

judgment (#28). I have considered the motion and all of the papers and pleadings on file. For

the reasons set forth below, defendants' motion is granted and Goninan's claims are dismissed.

## FACTUAL BACKGROUND

Goninan is an incarcerated person who has been intermittently housed at the Oregon State

Penitentiary ("OSP") under the Oregon Department of Corrections ("ODOC") since December

27, 2007. Goninan identifies himself as a practicing Satanist.

Early in his sentence, Goninan requested *The Satanic Bible* from ODOC personnel.[1]  In

February 2009, after some correspondence with OSP chaplains, ODOC denied Goninan's request

for *The Satanic Bible*. In a letter outlining the reasons for the denial, ODOC Assistant Director

of Transitional Services Ginger Marth stated the following:

> *The Satanic Bible* . . . promotes acts of vengeance, self-indulgence, and self-
> gratification. [It] encourages its readers to engage in actual and symbolic acts of
> violence against one's enemies, to prey upon the weak, to conduct violent rituals, and
> to reject authority. Such behaviors have absolutely no place in a prison environment
> and pose a significant threat to the maintenance of institutional safety, security, and
> order. Furthermore, the values and acts espoused in *The Satanic Bible* are completely
> inconsistent with the Department's fundamental goals of inmate rehabilitation and
> the pursuit of a nonviolent, law-abiding life.

Dec. of Dennis Holmes, Att. 2, #32.

In December 2009, Goninan filed a grievance expressing his belief that ODOC has a

policy of purchasing religious books only for inmates who practice mainstream religions, and

---

[1] It appears that initial communication with ODOC personnel regarding this request was
informal or undocumented. The only evidence of Goninan's first request for *The Satanic Bible*
in the record is Ginger Marth's refusal of the same. *See* Dec. of Dennis Holmes, Att. 2, #32.

attacking ODOC's failure to apply that alleged policy to Satanists.

In January 2010, Goninan wrote to defendant Dennis Holmes and requested that *The Satanic Bible* as well as other Satanic literature be provided to him free of charge. He was informed by ODOC personnel that it is not the policy of ODOC to purchase religious literature for inmates. Instead, ODOC relies on donated literary materials from community interests to support their collections. Defendant Dennis Holmes offered to contact a satanic organization to determine if they would donate any requested authorized material to OSP.

In April 2010, Goninan submitted another request, this time seeking a yarmulke and a kosher diet in support of his Jewish faith. Goninan was consulted by ODOC personnel seeking to clarify his faith and Goninan denounced Satanism in favor of Judaism. Goninan's dietary accommodation requests were granted in June 2010. Goninan has since clarified this issue, explaining that his experimentation with other religions led to his renewed faith in Satanism. Goninan cites to his satanic facial tattoos to prove the sincerity of his beliefs.

In January 2011, Goninan filed a second grievance requesting that ODOC purchase three texts by Satanist author Anton LaVey; *The Satanic Bible*, *The Satanic Rituals*, and *The Satanic Witch*. That grievance was denied because Goninan had grieved the same issues in his December 2009 grievance. Goninan repeated this grievance in June 2011, and additionally requested ODOC's religious services to provide free satanic literature for inmates. That grievance was also denied as redundant.

In October 2011, Goninan again requested *The Satanic Bible* and other satanic materials. He submitted that grievance and a grievance appeal to "the boss of" the grievance coordinator, contending that the grievance coordinator violated ODOC's grievance procedures in returning his

June 2011 grievance. That grievance was ultimately returned to Goninan because of ODOC's policy disallowing grievance appeals.

In January 2012, Goninan prepared an extended grievance appeal which rested on alleged religious discrimination by ODOC, arising from the fact that other inmates are allowed to possess the primary literature of their chosen religions, yet Satanists are barred from doing so. Goninan posed the following question:

> . . . [W]hy can a poor Christian [inmate] get a free bible, a poor jew get a Torah, or a poor muslim a Qu'ran? And so on. I have a right to be treated equally in my religion. So given all of this, tell me why I can't have *The Satanic Bible* or *[The] Satanic Rituals* when other religions can have theirs.

Dec. of Dennis Holmes, Att. 6, #32 (corrections throughout). Goninan pointed to violent themes contained in other, authorized scripture to support an argument for the authorization of *The Satanic Bible* and other satanic literature. Goninan further posited that, while radical Satanists indeed exist, there are similar radical followers of other religions. In response, ODOC personnel informed Goninan that *The Satanic Bible* was still unauthorized literature, but informed Goninan of three other authorized pieces of satanic religious literature available to him in the prison library. Shortly after submitting that complaint, Goninan penned a series of letters to ODOC officials arguing approximately the same points.

In February 2012, Goninan was contacted regarding his grievance and letters by defendant Gary Sims, Administrator of Religious Services at ODOC. Sims repeated the reasons for denial of Goninan's request and asserted that ODOC still disapproves *The Satanic Bible* and other texts as allowable inmate property. Sims informed Goninan once again of alternative approved satanic literature, including *Satan Speaks*, *The Devil's Notebook*, and the

*Necronomicon*, which Holmes identified as predominant pieces of literature in the field of

Satanism. Sims also informed Goninan of approved satanic ritual items, including a pendant,

chain medallions, and satanic altar cloths. Sims outlined and advised Goninan on the procedures

to obtain all of these items.

Later that month, Goninan prepared a response simply requesting ODOC's reasoning for

the repeated disapproval of his request. While he essentially restated his earlier grievances, he

additionally asserted that "I cannot practice my religion meaningfully without *The Satanic Bible*

or *Book of Satanic Rituals*[,] those are the most important books to my religion and I need them."

Dec. of Dennis Holmes, Att. 6, #32, 11. He further stated that "no one in all of ODOC [has]

given me a reason why I can't have those books other than [they're] not allowed. But tell me in

detail why not." *Id.* In response, Ginger Marth stated the following:

> The Religious Land Use and Institutionalized Person Act (RUIPA) [sic] of 2000 is
> the federal law the department is required to follow in making decisions regarding
> religious issues involving our prisons. This law requires that department officials
> individually review any Satanic literature or item requested by an inmate. The
> department's policy decision to not allow the *Satanic Bible* is based on a thorough
> reading of the publication and the department's judgment that specific writings in the
> book promote or advocate revenge and retribution by inmates and pose[] a risk of
> violence and threat to internal order and the safety of inmates and staff. Safety and
> security are the first priorities of the department.

Dec. of Dennis Holmes, Att. 6, #32, 12.

Thereafter, in April 2012, Goninan submitted a discrimination complaint in conformity

with ODOC's grievance procedures. He challenged the denial of his repeated requests for *The

Satanic Bible* and repeated his allegations of hypocrisy in ODOC's policies and authorizations of

other religious materials. Defendant Dennis Holmes responded to this complaint by reaffirming

that the other religious texts—the Quran and Holy Bible, primarily—are approved and not

Page 5 - OPINION AND ORDER

considered security threats. Holmes also explained the methods by which ODOC security personnel determine whether specific items are perceived security threats. Holmes provided a litany of reasons, discussed below, for ODOC's continued unwillingness to authorize *The Satanic Bible*.

A final religious accommodation request was submitted by Goninan to an ODOC chaplain and Goninan was approved for two additional satanic books, the *Necronomicon Spellbook* and *The Devil's Notebook*. Holmes purchased those two books and made them available in OSP's chapel library. Aside from the filings in this case, there is no further correspondence on this topic between Goninan and ODOC personnel.

**PROCEDURAL BACKGROUND**

Goninan filed this prisoner civil rights action on August 28, 2012 pursuant to 42 U.S.C. 1983. On or about November 26, 2012, defendants timely filed their answer.

Thereafter, on January 4, 2013, defendants filed this motion on the grounds that no constitutional or statutory violation occurred and, in the alternative, that defendants are entitled to qualified immunity against Goninan's constitutional claims. Along with their motion, defendants filed a supporting memorandum (#28) and several supporting declarations (#30–32).

On January 7, 2013, this court issued a summary judgment advice and scheduling order (#36) specifically advising Goninan that when a party makes a motion for summary judgment that is properly supported by declarations, the non-moving party may not simply rely on the contents of the complaint. Goninan was informed that he must set out specifics facts in declarations, depositions, answers to interrogatories, or other authenticated documents that contradict the facts shown in defendant's declarations and documents, and show that there is a

genuine issue of material fact for trial or demonstrate why the moving party is not otherwise entitled to judgment as a matter of law.

On October 9, 2013, this court ordered Goninan to show cause (#57) as to why defendants' motion for summary judgment should not be granted. Goninan did not respond to this order, but instead submitted a "request of the court" (#59) explaining that he lost access to legal materials he would otherwise use to aid him in supporting his case.

Thereafter, on October 25, 2013, Goninan submitted his response in opposition to defendants' motion (#61) as well as his second motion to stay this case (#62) due to a finding of Goninan's incompetence, his relocation to a mental health facility, and a lack of access to his materials. After granting that stay, this court later learned of Goninan's return to the care of ODOC. The court subsequently ordered Goninan to submit a supplemental response to defendants' motion for summary judgment and lifted the second stay on this case.

On September 18, 2014, Goninan filed his supplemental response to defendants' second motion for summary judgment (#71), to which defendants replied on October 20, 2014 (#76).

## LEGAL STANDARD

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is not proper if material factual issues exist for trial. *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995). The substantive law governing a claim or defense determines whether a fact is material. *See*

Page 7 - OPINION AND ORDER

*Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 369 (9th Cir. 1998). In evaluating a

motion for summary judgment, the district courts of the United States must draw all reasonable

inferences in favor of the nonmoving party and may neither make credibility determinations nor

perform any weighing of the evidence. *See, e.g., Reeves v. Sanderson Plumbing Prods., Inc.*, 530

U.S. 133, 150 (2000); *Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 554–55 (1990).

## DISCUSSION

Goninan contends that ODOC's prohibition on certain literary material associated with

Satanism violates his right to freely exercise his religion. Pl.'s Response, #61, 2. He further

contends that ODOC violates his right to equal protection by allowing prisoners to possess other

religious texts that extol themes he perceives to be similar to those for which ODOC refuses to

authorize the texts at issue. Pl.'s Supp. Response, #71, 2. Additionally, he contends that

ODOC's prohibition of these texts violates his statutory rights under the Religious Land Use and

Institutionalized Persons Act, 42 U.S.C. § 2000cc–1 ("RLUIPA"). Complaint, #2, 2. My

analysis of those claims follows.

**A.      The Requested Texts**

According to ODOC's Administrator of Religious Services and Custodian of Records,

Dennis Holmes, the teachings of *The Satanic Bible*, *The Satanic Witch*, and *The Satanic Rituals*

promote behavior that is a threat to the safety and security of prison staff and inmates. Those

teachings include: (1) aggression against anyone who believes differently than the Satanist; (2)

defiance of institutional authority, both secular and religious; (3) casting of spells and magic,

including the seeking of physical, mental, and emotional destruction of the victim; (4)

disregarding the lives and well being of others; and (5) advocacy and incitement of acts of

Page 8 - OPINION AND ORDER

violence, including human sacrifice, on anyone the practitioner believes has acted unacceptably.
Dec. of Dennis Holmes, #32, 3–5.

Holmes provides several specific reasons for ODOC's continued unwillingness to
authorize inmate possession of the texts at issue. He asserts that the texts advise Satanists to

> . . . perform any act according to his desire. If this fulfilled desire or act is challenged
> by authorities, then the Satanist is told he is entitled to his choice or pleasure and that
> there should be no restraint on the part of the authorities . . .

*Id.* at ¶ 14. Holmes also refers to teachings in the texts that encourage Satanists not to simply
disagree with other religious beliefs, but to be highly antagonistic to anyone with such beliefs.
*Id.* at ¶ 15. Holmes states that texts' direct endorsement of defying institutional authority and
incitement of violence can be extremely dangerous to the safety of staff and inmates. Id. at ¶ 16.
Further, Holmes notes that texts teach that

> The power of the Satanist's faith is in the casting of spells and magic. The physical,
> mental and emotional destruction of the 'sacrifice' (victim) is sought. Satanists have
> a total disregard for the lives and well-being of others. The value of other humans
> is found only in the contribution which that individual can make to the indulgence
> of the Satanist.

Id. at ¶ 17.

Holmes concludes his analysis by noting that the texts at issue "specifically advocate and
incite practitioners to perform acts of violence, including human sacrifice, on anyone that the
practitioner believes has acted unacceptably . . ." and that "[i]n the volatile prison setting, this . . .
can be extremely dangerous to the safety of staff and inmates." *Id.* at ¶ 18. Goninan concedes
that the texts advocate vengeance but argues that, because the bible also includes vengeful
themes, he should be allow to possess these texts nonetheless. Pl.'s Supp. Response, #71, 2.

Other courts have recognized that "much of [*The Satanic Bible*] a`dvocates preying on the

weak in any way possible for one's own gratification[.]" *Carpenter v. Wilkinson*, 946 F. Supp.

522, 529 (N.D. Ohio 1996) (quoting extensively from the text of *The Satanic Bible*); *see also*

*McCorkle v. Johnson*, 881 F.2d 993, 995–96 (11th Cir. 1989) (the author of *The Satanic Bible*,

*The Satanic Witch*, and *The Satanic Rituals* "states that right and wrong have been inverted too

long" and "declares that hatred of ones [sic] enemies is of utmost importance; revenge should be

a top priority"); *Winford v. Frank, No. 06–C–1000*, 2008 WL 35978, at *3 (E.D. Wis. Feb. 8,

2008) ("*The Satanic Bible*, by Anton Szandor LaVey preaches self-indulgence, self-gratification

and vengeance . . . [and] also advocates that the weak are here to serve the strong, that believers

should rebel against the laws of man and hate authority, and that bodily impulses are to be

pursued regardless of the consequences"); *Burton v. Frank, No. 03–C–0374*, 2004 WL 1176171,

at *4 (W.D. Wis. May 20, 2004) (*The Satanic Bible* "advocates the murder of 'totally obnoxious

and deserving individuals,' exaction of vengeance through violence, mutilation and murder of

anyone a Satanist believes to be his enemy and annihilation of the 'festering fragments of the

body of he who would detain me [,]'" and "challenges its readers to rebel against the law of man

and engage in symbolic acts of violence against one's enemies") (quoting *The Satanic Bible*).

## B.    The First Amendment Free Exercise Claim

"Inmates retain the protections afforded by the First Amendment, 'including its directive

that no law shall prohibit the free exercise of religion.'" *Shakur v. Schriro*, 514 F.3d 878, 883–84

(9th Cir. 2008).  Prisons may adopt regulations and restrictions that potentially impinge on an

inmate's constitutional rights if those regulations are "reasonably related to legitimate

penological interests." *Turner v. Safley*, 482 U.S. 78, 89, 107 S. Ct. 2254, 2261 (1987).

Legitimate penological interests include "security, order, and rehabilitation." *Procunier v.*

*Martinez*, 416 U.S. 396, 413, 94 S. Ct. 1800, 1811 (1974). *Turner* introduced a four-factor test

to resolve prison regulation-based disputes. That test applies in the context of a claimed burden

on a prisoner's right to the free exercise of religion. *Alvarez v. Hill*, 518 F.3d 1152, 1156 (9th

Cir. 2008) ("*Turner* [ ] . . . governs inmate free exercise claims brought under the First

Amendment").

> The four-factor *Turner* test considers:
>
> (1) whether the regulation is rationally related to a legitimate and neutral
> governmental objective, (2) whether there are alternative avenues that remain open
> . . . to exercise the right, (3) the impact that accommodating the asserted right will
> have on other guards and prisoners, and on the allocation of prison resources; and (4)
> whether the existence of easy and obvious alternatives indicates that the regulation
> is an exaggerated response by prison officials.

*Prison Legal News v. Lehman*, 397 F.3d 692, 699 (9th Cir. 2005) (*citing Turner*, 482 U.S. at 89,

107 S. Ct. 2254). Courts evaluate the policies of a jail or prison with "due regard for the

'inordinately difficult undertaking' that is modern prison administration," recognizing that

"certain proposed interactions, though seemingly innocuous to laymen, have potentially

significant implications for the order and security of the prison." *Thornburgh v. Abbott*, 490 U.S.

401, 407, 109 S. Ct. 1874 (1989) (*quoting Turner*, 482 U.S. at 85).

Further, the judgment of correctional officials is entitled due deference, especially when

plaintiff provides no contrary evidence. *See Pell v. Procunier*, 417 U.S. 817, 827 (1974)

(judgment of correctional officials in security matters is "peculiarly within the province and

professional expertise of corrections officials, and, in the absence of substantial evidence in the

record to indicate that the officials have exaggerated their response to these considerations,

courts should ordinarily defer to their expert judgment in such matters"). Goninan offers

excerpts of essays and other satanic texts to counter ODOC's evidence and testimony as to the

problematic tenets of the texts at issue.  Pl.'s Supp. Response, #71, ¶ 2.  Also, Goninan solely

objects to the ODOC's failure to authorize satanic texts, but omits in his arguments the fact that

ODOC has authorized other satanic literature for reading and possession.  The evidence proffered

by ODOC is therefore uncontradicted.

　　　　The evidence in the record shows that the three Anton LaVey works at issue, *The Satanic*

*Bible*, *The Satanic Witch*, and *The Satanic Rituals,* advocate violence, criminal activity, and

defiance of authority.  As explained above, Holmes' characterization of the texts is supported by

the record and the findings of other courts around the country.  Additionally, the conclusions

proffered by defendants regarding the dangers posed by this material are entitled to deference.

*See, e.g.*, *Pell*, 417 U.S. at 827.  As a result, *Turner*'s first factor is satisfied because there is a

rational connection between the restriction and the legitimate governmental interest justifying the

restriction.  *See, e.g.*, *Doty v. Lewis*, 995 F. Supp. 1081, 1086–87 (D. Ariz. 1998) (because "a

prison creates a haven for the strong to harm, imperil and manipulate the lives of the weak," texts

which "advocate[] hurting someone who, in the opinion of the Satanist, deserves to be harmed

and destroyed," create a danger to the safety of the prison).

　　　　ODOC does not ban satanic religious material in general.  Instead, it regulates all

literature on a case-by-case basis.  Goninan is free to request other books or accommodations that

are not inconsistent with the prison's prohibitions and, as the record reflects, he has successfully

done so regarding other satanic literature.  *See, e.g.,* Dec. of Dennis Holmes, #32, ¶ 10 (ODOC

has provided Goninan with three satanic texts: *Satan Speaks*, *The Devil's Notebook*, and *The*

*Necronomicon*).  Therefore, *Turner*'s second factor is satisfied due in part to the fact that other

Page 12 - OPINION AND ORDER

satanic texts are available to Goninan[2] and in part to the fact that other avenues of practicing his religion remain available to Goninan.

Holmes clearly articulates the perceived adverse impact of admitting these texts for inmate possession. It is clearly established that the books' endorsements of violence and defiance of authority could negatively impact prison staff and other inmates. *E.g., Burton*, 2004 WL 1176171, at \*5 (finding the third *Turner* factor satisfied when, deferring to the opinions of prison administrators, court concluded that inmates would be more likely to behave in ways that would adversely affect other inmates, such as engaging in strong-arming and physical abuse, after reading *The Satanic Bible*, and would also create more work for guards, disciplinary staff, and health services workers).

Regarding the fourth *Turner* factor, Goninan does not identify any alternatives that would not compromise the prison's interest in security and safety. Where there are no obvious alternatives that would protect against disruptions to the peaceful and effective administration of the prison, it is less likely that the restriction is an exaggerated response by prison officials. *Turner*, 482 U.S. at 90. Based on all of the facts and contents of the texts at issue, the tenets of those works are simply incompatible with the prison setting. The fourth *Turner* factor is therefore satisfied in defendants' favor.

Balancing the *Turner* factors, I conclude that defendants' prohibition on allowing inmates to possess *The Satanic Bible*, *The Satanic Witch*, and *The Satanic Rituals* is reasonably related to ODOC's legitimate penological interests in security and safety. I therefore grant defendants'

---

[2] While Goninan asserts that other available satanic texts were never brought to his attention, correspondence contained in the record between Goninan and ODOC personnel shows that assertion to be false. *See, e.g.*, Dec. of Dennis Holmes, #32, Att. 7.

motion on Goninan's free exercise claim.

**D.    The Fourteenth Amendment Claim**

In his Fourteenth Amendment claim, Goninan asserts that his right to equal protection has been violated because he has been denied possession of *The Satanic Bible*, *The Satanic Witch*, and *The Satanic Rituals* while followers of other religions are allowed to possess their sacred texts.

As stated previously, Goninan was provided with satanic texts and additional information enabling him to procure authorized satanic literature from community organizations based on ODOC's literature donation policy.  Goninan alleges that other prison inmates have access to religious texts, and that some of the content of those texts present themes similar to those contained in the unauthorized texts at issue.

"The Equal Protection Clause . . . is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439, 105 S. Ct. 3249 (1985) (*citing Plyler v. Doe*, 457 U.S. 202, 216, 102 S. Ct. 2382 (1982)).  A prisoner is entitled "to 'a reasonable opportunity of pursuing his faith comparable to the opportunity afforded fellow prisoners who adhere to conventional religious precepts.'" *Shakur v. Schriro*, 514 F.3d 878, 891 (9th Cir. 2008) (*quoting Cruz v. Beto*, 405 U.S. 319, 321–22, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972) (*per curiam*)).  However, "[t]here is nothing in the Constitution which requires prison officials to treat all inmate groups alike where differentiation is necessary to avoid an imminent threat of institutional disruption or violence." *Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 136, 97 S.Ct. 2532, 2543 (1977).

Despite Goninan's extensive commentary on the themes of Christian and Islamic

literature, ODOC is entitled to differentiate amongst literature based on varying degrees of

perceived threats. I do not reach Goninan's arguments on the contents of other texts because the

facts show that ODOC provides Goninan an opportunity to pursue his faith in a way comparable

to his fellow prisoners that is reasonable under the circumstances, primarily regarding the

legitimate risks ODOC personnel have identified as arising from the satanic texts. Accordingly,

because the restriction at issue here is reasonably related to penological concerns over avoiding

threats of institutional disruption and violence, it is not a violation of plaintiff's Fourteenth

Amendment right of equal protection. Defendants' motion for summary judgment is granted as

to Goninan's Fourteenth Amendment claim.

## C.    RLUIPA Claim

To state a claim under RLUIPA, a plaintiff must show that an arm of the government has

"imposed a substantial burden on his religious exercise." *Florer v. Congregation Pidyon*

*Shevuyim, N.A.*, 639 F .3d 916, 921 (9th Cir. 2011). Under RLUIPA, a plaintiff bears the initial

burden of setting forth a prima facie claim that the "policy and its punitive sanctions designed to

coerce him to comply with that policy constitute a substantial burden on the exercise [of] his

religious beliefs." *Warsoldier v. Woodford*, 418 F.3d 989, 994 (9th Cir. 2005). Once the initial

burden is met, the burden then shifts to defendants to show that any substantial burden on

plaintiff's "exercise of his religious beliefs is both 'in furtherance of a compelling governmental

interest' and the 'least restrictive means of furthering that compelling governmental interest.'"

*Warsoldier*, 418 F.3d at 995 (quoting 42 U.S.C § 2000cc–1(a); § 2000cc–2(b)). RLUIPA is

broadly construed in favor of protecting an inmate's right to exercise his religious beliefs. *Id.*

Defendants argue that, even assuming that Goninan is a sincere practitioner of Satanism

and that the exclusion of the texts at issue amounts to a substantial burden on his religious

exercise, they are nonetheless entitled to summary judgment on the RLUIPA claim because

prohibiting the texts is the least restrictive means to achieve a compelling governmental interest.

I agree.

The Supreme Court indicates that, similar to First Amendment claims challenging prison

regulations, courts analyzing claims under RLUIPA are to give deference to prison officials'

expertise regarding prison safety and security:

> We do not read RLUIPA to elevate accommodation of religious observances over an
> institution's need to maintain order and safety. Our decisions indicate that an
> accommodation must be measured so that it does not override other significant interests.
> In [*Estate of Thornton v.*] *Caldor, [Inc.*, 472 U.S. 703 (1985)], the Court struck down a
> Connecticut law that "arm[ed] Sabbath observers with an absolute and unqualified right
> not to work on whatever day they designate[d] as their Sabbath." 472 U.S., at 709, 105 S.
> Ct. 2914. We held the law invalid under the Establishment Clause because it
> "unyielding[ly] weigh[ted]" the interests of Sabbatarians "over all other interests." *Id.* at
> 710,105 S. Ct. 2914.
>
> We have no cause to believe that RLUIPA would not be applied in an appropriately
> balanced way, with particular sensitivity to security concerns. While the Act adopts a
> "compelling governmental interest" standard, . . . "[c]ontext matters" in the application of
> that standard . . . Lawmakers supporting RLUIPA were mindful of the urgency of
> discipline order, safety, and security in penal institutions . . . They anticipated that courts
> would apply the Act's standard with due deference to the experience and expertise of
> prison and jail administrators in establishing necessary regulations and procedures to
> maintain good order, security and discipline consistent with consideration of costs and
> limited resources.

*Cutter v. Wilkinson*, 544 U.S. 709, 722–23 (2005) (internal quotation, citations, and footnote

omitted). Additionally, the Court expressly stated that "prison security is a compelling state

interest and deference is due to institutional officials['] expertise in this area." *Id.* at 725, n. 13

(internal quotations omitted).

Based on my analysis above regarding the *Turner* factors and the general facts concerning

Goninan's claims, I conclude that ODOC officials are justified in considering the texts at issue likely to create serious security and safety risks within the prison, both for inmates and prison staff. Defendants show a compelling state interest as required by *Cutter*. Additionally, preventing access to the literature at issue is the least restrictive means to meet that compelling interest because the material contained in the texts themselves creates the perceived risks and there is no less restrictive means for prevention than simply prohibiting the texts outright.

I therefore grant defendants motion for summary judgment on the RLUIPA claim.

## CONCLUSION

Consistent with the foregoing, defendant's motion for summary judgment (#28) is granted as to Goninan's claims. Those claims are hereby dismissed with prejudice.

IT IS SO ORDERED.

Dated this 3rd 4th day of December, 2014.

_____
Honorable Paul Papak
United States Magistrate Judge

Page 17 - OPINION AND ORDER